## In re Estate of Ernesto W. Rangamar, Deceased.
### Appeal No. 92-029
### Civil Action No. 89-0369
### December 15, 1993

---

Argued and Submitted June 24, 1993

Counsel for appellant Luciano I. Rangamar: Theodore R. Mitchell & Jeanne H. Rayphand, Saipan.

Counsel for appellee Raphael I. Rangamar: Timothy H. Bellas, Saipan.

BEFORE: DELA CRUZ, Chief Justice, and VILLAGOMEZ and ATALIG, Justices.

ATALIG, Justice:

This is an appeal of a probate court order permitting the partitioning of three of the five parcels of real property in the estate of Ernesto W. Rangamar ("Ernesto"). The appellant, Luciano I. Rangamar ("Luciano"),

contends that Dolores R. Rabauliman ("Dolores"), the eldest daughter of the decedent, is the customary trustee for the estate property under Carolinian custom. As such, Luciano argues that the parcels may not be partitioned unless the entire family consents. We hold that the three contested parcels may be partitioned, because the lands are either no longer subject to Carolinian land custom or were never Carolinian family land.

## ISSUES AND STANDARD OF REVIEW

■ The dispositive issue on appeal is whether the trial court erred in finding that the family failed to treat the land in accordance with Carolinian land tenure custom.[1] This is a mixed question of law and fact which is reviewed de novo. *See Trinity Ventures, Inc. v. Guerrero*, 1 N.M.I. 54, 59-60 (1990). Before we reach this issue, however, we need to determine whether or not the properties in question are lands subject to Carolinian land custom. This issue is also a mixed question of law and fact, dependent upon how the land was acquired and treated.

## FACTS AND PROCEDURAL BACKGROUND

Ernesto, a Carolinian, died intestate on October 12, 1980. On May 26, 1987, the Marianas Public Land Corporation ("MPLC") issued a quitclaim deed for agricultural homestead Lot 056 D 01[2] to the "Heirs of Ernesto W. Rangamar," pursuant to the Homestead

Waiver Act. This land was subsequently divided into three parcels, Lots 1835 New-1-1, 1835 New-1-R1, and part of Lot 1835 NEW-1-2.[3]

On April 19, 1988, the heirs also received Lot 1835 NEW-1, 1835 NEW-3 and 1835 NEW-R/W, as their share of a partitioning of the estate of Maria Wabol Rangamar ("Maria"), Ernesto's mother, between the Ernesto's heirs and those of his sister Dolores Rangamar Fitial ("Fitial").[4]

On March 7, 1989, a lease was executed between the Ernesto's heirs, as lessors, and Dongsan America Corporation (Saipan) Ltd. ("Dongsan"), involving Lots 1835 NEW-1-1 and 1835 NEW-1-2.[5] Section 2 of the lease agreement with Dongsan required the lessors to have the court determine Ernesto's heirs.

On March 23, 1989, Ernesto's son Luis I. Rangamar ("Luis") filed a petition for letters of administration of Ernesto's estate. He listed the sole asset of the estate as Lot 056 D 01. Luis was appointed administrator of the estate, and on May 12, 1989, he filed a motion for determination of heirship. In his motion, Luis amended his original petition to reflect that there were no assets belonging to the estate. The motion stated that the reason for seeking the determination of heirship was that Lot 056 D 01 was granted by MPLC to the "heirs" of Ernesto W. Rangamar without specifying their respective names.

On June 19, 1989, the probate court issued a decree declaring Ernesto's heirs to be his eleven children: Luis, Raphael I. Rangamar ("Raphael"), Lorenzo I. Rangamar, Daniel I. Rangamar, Vicente I. Rangamar ("Vicente"), Ricardo I. Rangamar, Dolores, Ana Rangamar Cruz, Delgadina I. Rangamar, Fidelia I. Rangamar, and Luciano. Dolores was his oldest surviving daughter and Raphael the oldest surviving son.

Vicente died on April 28, 1991. Loretta Rangamar, Vicente's spouse, and Raphael petitioned for letters of administration for Vicente's estate. Dolores objected to the petition, alleging that parcels of land included in Vicente's estate were also the subject of the probate of Ernesto's estate. On August 23, 1992, the court stayed

---

[1] The appellant also raises two other issues: (1) whether the trial court erred in not granting final distribution of the lands of the estate to Dolores Rabauliman as customary trustee for the use of the lineal heirs of Ernesto W. Rangamar; and (2) whether the court erred in its decision to partition the land in the estate. However, these two issues are resolved by the issues stated in the text.

[2] The lot is described in the deed as follows:

Tract/Lot No. 056 D 01 containing an area of 13,092 square meters, more or less, as shown on the Division of Lands and Surveys Official Survey Plat Number 056 D 00 dated May 5, 1987, the description therein being incorporated herein by reference.

Quitclaim Deed for Agricultural Homestead Tract/Lot *in* Appellant's Excerpts of Record at Exhibit 20.

[3] Lot 1835 NEW-1-2 is a consolidation of the 4,491 square meters of former Lot 056 D 01 and all of Lot 1835 New-3. *See infra* note 4 and accompanying text.

[4] *See In re Estate of Rangamar*, Civ. No. 87-0423 (N.M.I. Super. Ct. Aug. 31, 1989) (Decree of Final Distribution); *see also id.* (Apr. 19, 1988) (Partition Order). Lots 1835 NEW-1, 1835 NEW-3 and 1835 NEW-R/W consist of, respectively, approximately 13,401, 4,003 and 3,186 square meters.

[5] Lease Agreement *in* Appellant's Excerpt of Record at Exhibit 35.

all proceedings involving Vicente's estate until the completion of proceedings involving Ernesto's estate.

Luis died on September 30, 1991. On February 10, 1992, Luciano petitioned for letters of administration of Ernesto's estate. At the hearing, Raphael requested to be appointed co-administrator. The court appointed Luciano and Raphael as the new co-administrators of Ernesto's estate. On June 4, 1992, Luciano filed an inventory for Ernesto's estate, listing the real property in the estate as Lots 1835 NEW 1-1, 1835 NEW 1-2, 1835 NEW 1-R1, 1835 NEW-R/W, and 1835 NEW-1.

On July 7, 1992, Luciano filed a "Petition for Decree of Final Distribution," to which Raphael objected. Luciano requested that all of the real properties be distributed to Dolores, as the customary trustee, for the use of Ernesto's lineal heirs. Raphael, on the other hand, requested that the property be partitioned among Ernesto's heirs.

The only issue before the probate court was whether Ernesto's children failed to treat Lots 1835 NEW 1-1, 1835 NEW 1-2 and 1835 NEW-1, in accordance with Carolinian land custom. On September 4, 1992, the court entered an order for the partition of the property because the family had not treated the lands in accord with Carolinian land custom. It noted that Ernesto and his sister themselves had earlier partitioned Maria's property following her death. Further, following Ernesto's death, Luis, a male heir, petitioned for and received the appointment as administrator of Ernesto's estate. All the heirs, including Dolores, the oldest female heir, were consulted regarding this petition and there were no objections. Dolores's own counsel petitioned for the appointment of Luciano, rather than Dolores, to replace Luis as administrator.[6] Finally, the court noted that Dolores never assumed any of the duties associated with a customary trustee. Luciano timely appealed.

## ANALYSIS

Luciano argues that the five parcels of land included in Ernesto's estate are Carolinian family land, and should be treated as such. He argues that, upon Ernesto's death, title passed to Dolores as the customary trustee for the benefit of all the lineal heirs of Ernesto. Thus, the land may not be partitioned among the heirs unless the entire

family consents. We hold that the parcels of land in dispute are not subject to Carolinian land custom and affirm the Superior Court's decision.[7]

## I. Applicability of Customary Law

 Because Ernesto died before the effective date of the CNMI probate code,[8] his property is subject to distribution pursuant to Title 13 of the Trust Territory Code. 8 CMC § 2102. However, since Title 13 does not provide for distribution of the estate of a person of Carolinian descent who died intestate, we resort to Carolinian custom for guidance. Section 102 of Title 1 of the Trust Territory Code mandates that the customs of the Trust Territory inhabitants are to have full force and effect of law where not in conflict with other laws.[9] We then must first determine what the applicable Carolinian land custom is and then determine if the land is subject to distribution under such custom. *Cf. In re Estate of Igitol*, 3 CR 906, 910 (N.M.I. Super. Ct. 1989).

 Our courts may take judicial notice of a firmly established custom. *Cf. Lajutok v. Kabua*, 3 TTR 630, 634 (App. Div. 1968). Our lower court has relied on two treatises as evidence of Carolinian land custom: Alexander Spoehr, SAIPAN: THE ETHNOLOGY OF A WAR-DEVASTATED ISLAND (Chicago Natural History Museum, Fieldiana: Anthropology, vol. 41, 1954) (hereinafter "Spoehr"), and Richard G. Emerick, *Land Tenure in the Marianas*, *in* 1 LAND TENURE PATTERNS: TRUST TERRITORY OF THE PACIFIC ISLANDS 217 (Office of the High Commissioner, Trust Territory of the Pacific Islands, 1958) (hereinafter "Emerick"). *See, e.g., Igitol*, 3 CR at 908-909; *Tarope v. Igisaiar*, 3 CR 111, 116 (N.M.I. Trial Ct. 1987). We will do so as well.

---

[7] We note that two of the five parcels in the inventory, Lots 1835 NEW-1-R1 and 1835 NEW-R/W, were not considered by the court for partitioning. See *supra*, facts and procedural background. However, our analysis would apply to these two remaining parcels because they share the same history and treatment as those in dispute.

[8] The probate code became effective February 15, 1984. *See* 8 CMC § 2102.

[9] 1 TTC § 102. The laws listed in 1 TTC § 101 with which custom may not conflict are: (1) the Trusteeship Agreement; (2) United States laws in effect in the Trust Territory; (3) Trust Territory laws and their amendments; (4) district orders and emergency district orders; (5) Trust Territory legislation; and (6) municipal ordinances.

---

[6] Luciano is the sixth oldest male of the heirs.

## II. Traditional Carolinian Land Custom

Most Carolinians in the Northern Marianas descend from Carolinians "who migrated . . . from . . . the Caroline chain." Emerick, *supra*, at 225.[10] With them they brought and were able to maintain for a while "much of their old social organization, customs and language." *Id.* at 225-26. Among these customs was "their traditional land tenure pattern." *Id.*

### A. Traditional Carolinian Land Tenure is Matrilineal

██ Traditional Carolinian land tenure is *matrilineal*, Spoehr, *supra*, at 333, and land descends by the *minimeal* lineage, i.e., mother to daughter, see *id.* at 335, 363. The land under this tenure system is *collectively owned and controlled by females*. See Spoehr, *supra*, at 333. This system was succinctly described in Emerick, *supra*:

> [T]he Carolinians on Saipan continued to operate within their traditional land tenure pattern. *Farm land and town lots and buildings are owned collectively by the female members of the matrilineal lineages.* Houses built by men become the property of their wives and on the death of the husband they continue to be so. *Lineage land is not divided when members of a lineage die.* The land is kept intact for the use of members who may build houses on it and cultivate sections of it but among whom ownership of the land is never divided. *It is the matrilineal lineage, then, which owns and controls the land.*

*Id.* at 225-26 (emphasis added). This form of ownership and control of the land, which has been likened to a corporate group, see Spoehr, *supra*, at 363, has, however, been otherwise influenced by the German, Japanese and American administrations. *Id.; see also* Emerick, *supra*, at 226.

### B. Land Registration Requirements of Foreign Administrations

The German administration[11] began a system of land registration under which both maternal lineage lands held collectively by females and lands received by Carolinian males under a newly-initiated homestead program were registered. *See, e.g.*, Spoehr, *supra*, at 363-65. Carolinian males received title to homestead land, see *id.* at 365 and Emerick, *supra*, at 226, which was recorded in their individual name. Spoehr, *supra*, at 77.

The Carolinian males that received property under the homestead program held the land individually. While some of these males gave their land to both female and male heirs, others chose to give the land only to their daughter(s) who then "subsequently founded a new matrilineal lineage." Emerick, *supra*, at 226; *see also* Spoehr, *supra*, at 365-66. Hence, the applicability of Carolinian land custom to such lands became dependent upon the subsequent treatment of the land by the *female* recipient(s) of the land.

Matrilineal land was held, pursuant to Carolinian land custom, collectively by the females and recorded in the name of the oldest female member of the maternal line, with the oldest holding title and acting more or less as a "trustee" for the rest of the lineage members.[12] *See generally Tarope*, 3 CR at 113.[13]

The Japanese administration continued the German administration's system of registering both land held individually and matrilineal land. Under the American administration, however, Carolinian lands began to be registered in either the name of an individual Carolinian or in the name of the heirs of a decedent, with a trustee designated without regard to gender. *See* Office of the High Commissioner, Trust Territory of the Pacific Islands, Trust Territory Land Management Regulation

---

[10] *See also* Alexander Spoehr, SAIPAN: THE ETHNOLOGY OF A WAR-DEVASTATED ISLAND [hereinafter "Spoehr"] 326 (Chicago Natural History Museum, Fieldiana: Anthropology, vol. 41, 1954) ("[T]he main body of the Saipan group [of Carolinians] migrated from atolls lying just to the west and north of Truk . . . .").

[11] The German administration in the Northern Mariana Islands began in November 1899 and ended with the possession of the German islands by the Japanese Navy in 1914. Spoehr, *supra* note 10, at 75, 83.

[12] The registration system did not usually record the names of the other female owners of the land. It was from this registration system that the term "customary trustee" evolved.

[13] When the registered female owner died, title was then registered in the name of the oldest surviving sister or the decedent's oldest daughter. Richard G. Emerick, *Land Tenure in the Marianas, in* 1 LAND TENURE PATTERNS: TRUST TERRITORY OF THE PACIFIC ISLANDS 226 (Office of the High Commissioner, Trust Territory of the Pacific Islands, 1958) (hereinafter "Emerick").

No. 1 (June 29, 1953) (*quoted in In re Estate of Dela Cruz*, 2 N.M.I. 1, 9-10 (1991)).

We note that the registration of these Carolinian customary lands with the foreign administrative authorities was done under their auspices and for their administrative purposes only.[14] Such registration practices were in direct conflict with the Carolinian notion of "collective ownership." *See* analysis, *supra*. As such, the receipt of documentary title by a Carolinian female was not indicative of the Carolinian land custom but rather of the administrative practices of foreign authorities.[15] We have concluded that Carolinian land custom is a matrilineal system of collective ownership, notwithstanding governmental administrative practices to the contrary.

## C. Carolinian Land Tenure Custom Continues to be Matrilineal

■ Luciano contends that because all the family members consented to the lease and partition, their actions were consistent with Carolinian land custom. This argument, however, is valid only with respect to estates to which the NMI probate code, under which both male and females have undivided interests and may hold

title as customary trustee, is applicable.[16] Because the probate code is not applicable to Ernesto's estate, we will follow true Carolinian land custom. Under this custom, ownership continues collectively in the females.

■ We agree that custom over time may gradually change by a uniform and common change in practice.[17] However, such changes are neither "legally binding [n]or accepted customs until they have at least existed long enough to have become generally known and have been peaceably and fairly uniformly acquiesced in by those whose rights would naturally be affected." *Lalou v. Aliang*, 1 TTR 94, 99-100 (Trial Div. 1954). "Mere agreement to new ways of doing things by those to be benefitted without the consent of those to be adversely affected, will not of itself work a sudden change of customary law." *Id.*, 1 TTR at 100 (citation omitted).

That the parties are in dispute in this matter itself demonstrates that not all Carolinian women acquiesce to the divestment of their ownership status under the Carolinian land tenure system.[18] We see no evidence in the record that a departure from Carolinian custom as articulated in Spoehr, *supra*, and Emerick, *supra*, is warranted.

■ We now hold that where the history of the land in an estate, to which the probate code is inapplicable, or the activities of the heirs in relation to the land, are consistent with Carolinian land custom, that custom should be applied and the female heirs will hold title. Otherwise, where the land is not family land or the females consented to treatment inconsistent with Carolinian land custom, the court may allow the division of the property among individual male and female heirs. *See, e.g.*, *Tarope*, 3 CR at 117-18 (Carolinian family by its own acts can destroy traditional land tenure pattern); *Igitol*, 3 CR at 911-12.

---

[14] "*For administration purposes* the name of the oldest female member of the lineage has always been entered as owner. Upon her death the next older sister or the eldest daughter of the deceased becomes, *in the eyes of the administering authority*, legal owner of the property." *Id.* (emphasis added).

[15] For example and by comparison, the German registration of lands on Truk in an individual name was presumed by the Trust Territory Courts to "not necessarily evidence . . . individual ownership." *Oneitam v. Suain*, 4 TTR 62, 73 (Trial Div. 1968) (citing Emerick, *supra* note 13, at 167 and quoting *Kono v. Mikael*, 2 TTR 466, 468 (Trial Div. 1963) ("'The Court has several times . . . taken . . . judicial notice that the German administration on Truk . . . did not distinguish between individually owned land and land controlled by a person as head of a group'")). The probate code has codified the land registration systems and not Carolinian custom in this respect. The oldest female member of the lineage, whether paternal or maternal lineage, is the customary trustee. However, the code recognizes the individual equal interest of the heirs regardless of gender. Consent requirements include both sisters and brothers, 8 CMC § 2909; males may hold title as customary trustees, 8 CMC § 2904(a)(2) (if no surviving sister, oldest surviving brother obtains title); and, under 8 CMC § 2904(b), "[a]ll members of the family shall have the same equal rights to the use of the land as the customary trustee has."

[16] *See infra* note 17.

[17] "Custom . . .'[is] [s]uch a usage as by common consent and uniform practice has become the law of the place, or of the subject matter, to which it relates . . . .'" *Lalou v. Aliang*, 1 TTR 94, 99-100 (Trial Div. 1954) (citation omitted).

[18] Spoehr notes that during the Japanese administration, sometimes female co-owners were listed, as opposed to the oldest woman in the lineage, as trustee. It was supposed that this resulted from the desire of some Carolinian females to protect their rights to the property. Spoehr, *supra* note 10, at 364.

## III. Real Property in the Estate not Subject to Carolinian Land Custom

 We conclude, after a careful examination of the history of Lots 1835 NEW-1-1, 1835 NEW-1-2 and 1835 NEW-1, as well as the heirs' treatment thereof, that the land is not subject to Carolinian land custom, and that the probate court did not err in ordering the partitioning of the property.

### A. Lots derived from Former Agricultural Lot 056 D 01

Lot 056 D 01 was received by Ernesto's heirs on May 26, 1987, from MPLC under the Northern Mariana Islands Homestead Waiver Act of 1980.[19] Disputed Lot 1835 New-1-1 and a portion of 1835 NEW-1-2 are derived from this land.

Lot 056 D 01 is not subject to Carolinian land custom for several reasons. First, this land did not descend to the heirs under the traditional maternal lineage. The land was deeded by MPLC as a homestead. Second, all of the heirs, including the males, are entitled to an equal undivided interest pursuant to the deed of conveyance from MPLC; this is in direct opposition to Carolinian land custom. Finally, the leasing of part of Lot 056 D 01 for fifty-five years[20] effectively removed a substantial portion of the property from the family for use by Ernesto's lineal heirs. The probate court thus properly decided that the land should be partitioned among the heirs.

### B. Lots Received from Estate of Maria Wabol Rangamar

Lot 1835 was owned by Maria, Ernesto's mother, before she died in 1960. The disputed Lot 1835 NEW-1 and former Lot 1835 NEW-3, now a part of Lot 1835 NEW-1-2, are derived from this land. Maria had two children, Ernesto and Fitial. This land was presumably matrilineal land when held by Maria. If, after Maria's death, Ernesto and Fitial treated the land as matrilineal land, it would be owned by Fitial, Maria's only daughter. Ernesto would not be entitled to any land interest. If the land was not treated in accordance with Carolinian land custom, then Ernesto and Fitial would own it as tenants in common. The record shows that both Fitial and Ernesto held the land as if tenants in common, and not in accordance with Carolinian land custom.[21] What passed to Ernesto's heirs is his undivided interest to Lot 1835, as tenant in common with Fitial.

After Ernesto's and Fitial's deaths, Lot 1835 was subdivided and partitioned by their heirs, with the consent of the females. A portion of this land was leased to Dongsan. These actions further indicate that the land was taken out of the matrilineal descent mold. Therefore, the court properly determined that the heirs did not follow Carolinian land custom. As such, the land at issue before us is no longer subject to such custom and may be further partitioned among Ernesto's heirs.

## CONCLUSION

Based on the foregoing, we **AFFIRM** the Superior Court's order allowing the partitioning of Lots 1835 New-1-1, 1835 New-1-2 and 1835 New-1 in the estate of Ernesto W. Rangamar and **REMAND** this matter for further probate proceedings.

---

[19] Title to this land was received nearly seven years after Ernesto's death. It is not clear from the record the exact manner in which the title was issued—for example, whether the homestead was initially given to Ernesto, or if it was the heirs proper that pursued the permit. However, as neither party to this appeal takes the position that the property does not belong in the estate, we will not entertain *sua sponte* the propriety of the inclusion of this parcel in Ernesto's estate.

[20] The remaining portion not leased appears to be Lot 1835 NEW-1-R1.

[21] *See* Affidavit of Miguel Fitial, in Appellee's Supplemental Excerpt of Record at 5 ("Prior to [her] death[,] Dolores R. Fitial . . . made an agreement with Ernesto . . . to Partition the said property").